UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

TAMEKA JACKSON,

                              Plaintiff,

              -against-

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                              Defendant.

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:__ 6/11/2014

13-CV-05655 (AJN)(SN)

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE ALISON J. NATHAN:**

Plaintiff Tameka Jackson brings this action pursuant to Section 205(g) of the Social

Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of the final determination

of the Commissioner of Social Security (the "Commissioner") denying her application for Social

Security Disability Insurance benefits ("DIB") and Supplemental Security Income ("SSI")

(collectively, "disability benefits").[1] Jackson moved, and the Commissioner cross-moved, for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. I

conclude that the administrative law judge ("ALJ") failed to develop the record fully and

misapplied the treating physician rule when he denied Jackson's application for benefits based

---

[1] Because the definition of "disabled" governing eligibility is the same for DIB and SSI, the term
"disability benefits" will be applied to both. Chico v. Schweiker, 710 F.2d 947, 948 (2d Cir. 1983)
(generally referring to "disability insurance benefits" because SSI regulations mirror DIB regulations);
Calzada v. Astrue, 753 F. Supp. 2d 250, 266–67 (S.D.N.Y. 2010) (same).

on her mental impairments. With respect to Jackson's physical impairments, however, I find that there is substantial evidence to support the ALJ's ruling and no legal error was committed.

Accordingly, for the reasons set forth below, I recommend that the plaintiff's motion to remand the case to the Commissioner for proper application of the treating physician rule and further development of the record be GRANTED in part and DENIED in part, and that the Commissioner's cross-motion for judgment on the pleadings be GRANTED in part and DENIED in part.

## PROCEDURAL BACKGROUND

On September 8, 2010, Jackson filed concurrent applications for DIB and SSI benefits, alleging an onset date for her disability of March 28, 2008. On December 21, 2010, the Social Security Administration (the "SSA") denied her applications, and on January 21, 2011, Jackson appealed, requesting a hearing before an ALJ. Jackson appeared *pro se* before ALJ Moises Penalver on November 22, 2011. The ALJ issued a decision on April 26, 2012, denying Jackson benefits. On March 23, 2013, the Appeals Council denied Jackson's request for review of the ALJ's decision, thereby rendering the decision of the Commissioner final.

On August 13, 2013, Jackson, through counsel, filed this action. On August 21, 2013, the Honorable Alison J. Nathan referred Jackson's case to my docket for a report and recommendation. On January 16, 2014, Jackson filed a motion for judgment on the pleadings with supporting memorandum of law. On February 18, 2014, the Commissioner filed a cross-motion for judgment on the pleadings with supporting memorandum of law. The parties filed no other opposition or reply briefs, and the motion is considered fully briefed.

## FACTUAL BACKGROUND

The following facts are taken from the administrative record.

### I.   Non-Medical Evidence

Jackson was born in 1977, and was 34 years old at the time of her hearing on November 21, 2011. She completed 11th grade and took the General Education Development ("GED") test, though the results were not available at the time of the hearing. Jackson has two children, who were 16 and 13 at the time of the hearing.

### II.   Medical Evidence

#### A. Psychiatric Impairments

##### 1. FEGS

Jackson was evaluated at FEGS on February 25, 2010. She reported treatment for schizophrenia and bipolar disorder in 2000 at St. Luke's Roosevelt Hospital, but stated that she currently was not receiving any mental health treatment. She described feeling depressed with a loss of interest in things, trouble sleeping, fatigue, and feeling fidgety and lethargic. Jackson could not use public transportation because of her fear of crowds. Jackson reported that she spent her days caring for her children and job hunting. She was able to wash dishes, wash clothes, sweep and mop the floor, shop for groceries, cook meals, and socialize. The attending physician diagnosed Jackson with depression, anxiety, and hypothyroidism. Because of Jackson's untreated depression and anxiety, and the need for a psychiatric evaluation, the physician concluded that Jackson could not work until she was stabilized.

3

### 2. Karen Horney Clinic[2]

Jackson was treated at the Karen Horney Clinic beginning in 2010. On April 14, 2010, Jackson was screened for intake at the clinic by a licensed social worker. Jackson reported that she was feeling "really stressed out a lot" and "depressed." (R. 454.) She kept "getting panic attacks." (Id.) Jackson described that she had been having panic attacks for as long as she could remember. These attacks made her heart beat fast and skip beats. Her palms would get sweaty, and she would feel as if she could not breathe. Jackson explained that her panic attacks occurred most often when she was around large groups of people, in crowds or on the subway. She experienced her first depressive episode about one month after her daughter was born, which coincided with the death of her grandmother. At that time, Jackson stayed in bed for days at a time. She would lash out at people and drank heavily.

Jackson explained that her "current mood symptoms" began after she lost her job as a medical assistant in March 2008. She described feeling depressed, with low energy and sleep problems. (R. 455.) She would then sometimes have a sudden and dramatic change in her mood, with high energy. She described herself as "hyper" during these periods and informed the social worker that she would get into many physical altercations. (Id.) Jackson denied any previous mental health treatment.

Jackson reported a history of abuse and trauma. Her mother used drugs and was physically abusive, and Jackson was raised by her grandmother. Her mother was diagnosed with schizophrenia and bipolar disorder and, at the time of the intake interview, was psychiatrically

---

[2] There are medical records from the Karen Horney Clinic that date back to 2008. The records addressing Jackson's mental impairments, however, do not begin until 2010.

4

hospitalized. Jackson's step-uncle raped her when she was nine. Jackson also was involved in a violent domestic relationship, though she denied any current violence.

The social worker described Jackson as alert and of average intelligence. Her memory was intact, but her mood was anxious and depressed. Her affect was constricted. Jackson denied having hallucinations or suicidal or homicidal ideations. Her insight was fair, and her judgment and impulse control were poor. She was diagnosed with bipolar disorder and panic disorder with agoraphobia. Her Global Assessment of Functioning ("GAF")[3] was 50-55.

On June 30, 2010, Jackson was evaluated by her therapist, Alexis Conason. The evaluation report was also signed by Dr. Paul, her psychiatrist. Jackson complained of panic attacks, anxiety, anger problems, paranoid delusions, fear of flying, and a traumatic history. Jackson noted that her fear of crowds made it difficult to ride the subway; sometimes it would take her 20 minutes or longer to get onto the subway. She was paranoid that people on the subway were staring at her, that men were following her, and that someone was going to attack her. Jackson reported that she had been in 12 physical fights, usually with women who were strangers, during the past 12 months. Jackson also reported drinking alcohol on the weekends,

---

[3] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV"), at 34 (4th ed. rev. 2000)). A GAF score of 41-50 represents serious symptoms (e.g., suicidal ideation or severe obsessional rituals) or a serious impairment in social or occupational functioning. A GAF score from 51-60 represents moderate symptoms (e.g., occasional panic attacks) or moderate difficulty in occupational or social functioning (e.g., few friends, conflicts with co-workers). The Court notes that the Fifth Edition of the DSM has discarded the use of GAF Scores. See Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013). The DSM IV, however, was in effect at the time of Jackson's treatment.

sometimes to the point of blacking out, and using marijuana daily. She denied using any other drugs.

The therapist described Jackson as cooperative, but somewhat quiet or shy. She was alert, attentive, and stable throughout the interview. Her thought processes were logical and goal oriented. Though she reported having delusions about people possibly attacking her, she denied any hallucinations. Her memory was intact and the therapist described her as having average intelligence. Her insight was fair, and her judgment and impulse control were poor. Jackson was diagnosed with bipolar disorder, panic disorder with agoraphobia, intermittent explosive disorder, and alcohol abuse. Her GAF was 40.[4]

There are several brief medical notes in the record signed by Dr. Paul, though much of the writing is illegible. These notes are dated January 7, 2010, August 20, 2010, February 11, 2011, March 20, 2011, and April 25, 2011.

On July 16, 2010, Dr. Paul signed a Treating Physician's Wellness Plan Report. Dr. Paul noted that Jackson's current diagnoses included depression, bipolar disorder, anxiety, panic disorder with agoraphobia, and intermittent explosive disorder. Jackson presented with an anxious and depressed mood. Her affect was constricted. She had a slow rate of speech and spoke in a low volume. Jackson stated that she had some paranoid delusions, including the belief that people on the subway stare at her and will attack her. She denied any audio/visual hallucinations or suicidal or homicidal ideation. The report indicated that she had poor judgment, poor impulse control, and fair insight.

---

[4] A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas such as work, judgment, or mood.

Dr. Paul noted that she was scheduled for weekly psychotherapy and due for an evaluation of medication on July 21, 2010. Jackson was in the early stages of treatment and her response to treatment was unclear at the time. Dr. Paul noted, however, that Jackson was motivated towards treatment and was forming a good working alliance with her therapist.

The report also indicated that Jackson's diagnosis or condition had not been resolved or stabilized. She had not yet begun medication and required more treatment to resolve her mental illness. Dr. Paul indicated that Jackson should be reassessed in six months and concluded that Jackson was "temporarily unemployable," noting that Jackson's psychiatric symptoms prevented her from working: "Amongst other issues, [Jackson] has difficulty leaving her home due to anxiety, paranoia, and panic attacks. Reassess . . . in 6 months." (R. 216.) These conclusions were based on an examination of the patient.

On July 21, 2010, Dr. Paul completed a psychiatric evaluation. He reviewed Jackson's family and medical history. He described her as having average intelligence. She was depressed with appropriate affect. He perceived no psychosis or suicidal or homicidal ideation. She was mildly suspicious. Jackson was alert and well-oriented with normal speech, language, orientation, and motor function. Dr. Paul stated that Jackson related well but had poor impulsivity. He diagnosed her with bipolar disorder, panic disorder with agoraphobia, and alcohol abuse. He recommended continued therapy and prescribed Abilify.

On January 1, 2011, Jackson's therapist completed a quarterly report for the period October 1 to December 31, 2010. Her diagnoses remained unchanged: bipolar disorder, panic disorder with agoraphobia, intermittent explosive disorder, and alcohol abuse. Jackson had attended a total of two sessions, but 12 sessions had been scheduled during the period. Her GAF was 40. The therapist noted that Jackson was unemployed and concluded that her "psychiatric

7

symptoms are barriers to gaining employment." (R. 480.) Her therapist also concluded that "her psychiatric problems have interfered" with her goal of completing college. (Id.) Jackson was motivated towards treatment, though her psychiatric symptoms and her home life further interfered with her ability to attend her therapy sessions. In addition, the injury to her knee resulted in Jackson's inability to leave her home for most of the quarter. This quarterly report was also signed by Dr. Paul.

On March 28, 2011, Jackson's therapist completed, and Dr. Paul signed, a discharge summary. She was discharged because of poor attendance. At the time of her discharge, Jackson's diagnoses remained unchanged and her GAF was 40. She was taking Abilify. Jackson was referred to New Beginnings treatment program with the hope that she would be able to attend treatment sessions more frequently and achieve her mental health goals.

On April 25, 2011, Dr. Paul indicated that the patient was discharged from the Karen Horney Clinic but needed one more month of her medications.

### 3. South Bronx Mental Health Council

On June 24, 2011, Jackson was interviewed for admission to the South Bronx Mental Health Council. She stated that she had been attending another clinic, but had been discharged because she could not get to the clinic due to her leg injury. She noted that she needed medication for her anxiety, depression, anger, and bipolar disorder. Jackson stated that she was diagnosed one year earlier and had never been hospitalized. Jackson was oriented and cooperative, but presented with a depressed mood. She had no suicidal or homicidal ideation. Jackson stated that she was not currently on medication but had been approximately two weeks

ago, including Ambien, Abilify, and Alprazolam. She was diagnosed with major depressive disorder. Her GAF was 65.[5]

On July 7, 2011, Jackson returned for another examination. She was cooperative and her speech was clear and at a normal rate. She made good eye contact and was alert. Her mood was anxious and depressed. Her affect was appropriate and full. Her impulse control and her ability to manage anger were fair. She expressed that she was preoccupied and anxious, particularly about her future and finding a job. Her judgment was appropriate and her insight fair. She was diagnosed with panic disorder with agoraphobia and personality disorder. Her GAF was 60. The psychiatrist recommended therapy and psychotropic medication.

On November 8, 2011, Jackson's therapist and psychiatrist signed a treatment plan review. Jackson was being prescribed Abilify, Paxil, and Wellbutrin. Her GAF was 60. Jackson remained depressed and anxious regarding her medical problems. She was compliant with services but tended to be guarded. Jackson reported feeling better with her medication. The review indicated as a primary "goal" to obtain psychiatric stability, with a target date of February 8, 2012.

### 4.  The Commissioner's Mental Health Examinations

#### a.  Dr. Dmitri Bougakov

On November 10, 2010, Dr. Dmitri Bougakov, a licensed psychologist, evaluated Jackson at the request of the Social Security Administration. Jackson was driven to the appointment by her uncle. She reported that she was currently seeing a psychiatrist and a

---

[5] A GAF score from 61-70 represents some mild symptoms or some difficulty in social, occupational, or school functioning but generally the individual is functioning pretty well.

therapist, and had been doing so since January 2010. She had been seeing Dr. Paul once a month and her therapist, Alexis Conason, twice a week since July 2010. Jackson also reported that she fractured her right kneecap about one month before the appointment. She had surgery at St. Luke's Hospital and was scheduled to have a second surgery. Jackson told Dr. Bougakov that she took Ambien and Abilify, but she had been unable to do so for about three weeks because she was taking the pain killer Percocet. She stated that she woke up frequently and her appetite was poor. She complained of dysphoric moods, crying spells, loss of interest, irritability, low energy, concentration difficulties, and a diminished sense of pleasure. She reported being symptomatic for approximately one year. She also told Dr. Bougakov that she was absent-minded, forgetting to do chores and keep appointments. Jackson denied any drug or alcohol abuse.

Dr. Bougakov indicated that Jackson was cooperative and related adequately. She was casually-dressed and well-groomed, appearing her age. She was in a wheelchair and her right leg was extended. Her gait, therefore, could not be assessed. Her posture and motor behavior were normal.

Jackson's eye contact was appropriate. Her speech was fluent and her voice was clear. Her thought processes were coherent and goal-directed. Her affect was dysphoric and her mood dysthymic. Her sensorium was clear. Jackson was oriented to person, place, and time. Her attention and concentration were intact, though her recent and remote memory skills were mildly impaired due to her depressive symptomatology. Dr. Bougakov estimated her intellectual functioning to be in the average range and described her general fund of information as "somewhat limited." (R. 224.) Her insight and judgment were both fair.

Jackson indicated that, on a daily basis, she was able to dress, bathe, and groom herself. She had a visiting nurse, however, who did the rest of the chores for her. She was able to manage money and was driven by her family to her appointments. Jackson told Dr. Bougakov that she did not spend time with friends and had a distant relationship with her family. She spent her days watching television, listening to the radio, and reading.

Dr. Bougakov found that Jackson could follow and understand simple directions and instructions and could perform simple tasks. She could maintain attention, concentration, and a regular schedule. She was somewhat limited in her ability to learn new tasks and perform complex tasks. She could, however, make appropriate decisions, relate adequately with others, and deal with stress. Dr. Bougakov concluded that the results of the examination were consistent with psychiatric problems, but did not indicate that Jackson's difficulties were significant enough to interfere with her ability to function on a daily basis. He diagnosed her with depressive disorder and a fracture of the right kneecap with surgery. He recommended that she continue with her current psychological and psychiatric treatment. In light of Jackson's mild cognitive limitations and depressive symptomology, her prognosis was guarded.

**b. Dr. V. Reddy**

On December 17, 2010, at the request of the Commissioner, Dr. V. Reddy, a state agency psychological consultant, completed a Psychiatric Review Technique form based on a review of Jackson's then-existing medical records. The disposition was based on section 12.04 – affective disorders. Dr. Reddy concluded that Jackson had a depressive disorder. In rating her functional limitations, Dr. Reddy identified no more than moderate limitations. Jackson had mild limitations in activities of daily living and social functioning. She had moderate difficulties in concentration, persistence, or pace. Dr. Reddy noted that Jackson had never had an episode of

11

deterioration of extended duration. Based on a record review, Dr. Reddy concluded that the

evidence did not establish the presence of the required criteria for a "C" listing impairment.

Dr. Reddy also completed a Mental Residual Functional Capacity Assessment for

Jackson. Dr. Reddy indicated that Jackson was moderately limited in the following categories:

(1) the ability to understand and remember detailed instructions; (2) the ability to carry out

detailed instructions; (3) the ability to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerances; (4) the ability to complete a normal

workday and workweek without interruptions and to perform at a consistent pace; (5) the ability

to maintain socially appropriate behavior and to adhere to basic standards of neatness and

cleanliness; (6) the ability to respond appropriately to changes in the work setting; and (7) the

ability to set realistic goals or make plans independently of others. In all other categories,

Jackson was only mildly impaired.

Dr. Reddy noted that Jackson reported receiving current outpatient mental health

treatment, but the records were not received, though they were requested. Dr. Reddy reviewed

Dr. Bougakov's report and concluded that Jackson's "allegations of limitations as a result of

ongoing psychiatric condition [were] partially credible and not wholly supported by objective

medical findings." (R. 243.) He noted that Jackson appeared capable of "the basic functional

requirements of unskilled work." (Id.)

## B. Physical Impairments

### 1. St. Luke's Roosevelt Hospital

On October 1, 2010, Jackson fell and fractured her right patella. On October 6, 2010, she

underwent surgery, including an open reduction and internal fixation of the right patella fracture.

There were no complications from the surgery, and upon being discharged from the hospital,

Jackson was allowed to bear weight with her right leg while wearing a Bledsoe brace, which locked her leg in extension. An x-ray taken on October 12, 2010, showed that the fragments of her patella were satisfactorily aligned and the patella was in satisfactory position. Follow-up x-rays on November 16, 2010, show that the two fragments were healing satisfactorily, with no joint space narrowing or effusion.

Jackson returned to the orthopedic clinic at St. Luke's on February 22, 2011. She complained of stiffness, but no pain, and was observed walking with a cane. Her range of motion was from 0 to 100 degrees, and increased density in the knee was indicative of the healing of the fracture. She was advised to continue using the cane and to undergo physical therapy. On May 10, 2011, Jackson's incision appeared to be well-healed and she had the same range of motion. The doctor discussed the possibility of removing the hardware from her knee. Jackson stated that she would like to wait until September.

On October 17, 2011, Jackson was seen for right knee pain. She complained of buckling and difficulty flexing the knee, even after five months of physical therapy. Upon examination, her right leg strength was full, except for her right quad (4+/5). She had no laxity in her right leg. Her range of motion was limited to 85-95 degrees. On October 31, 2011, Jackson returned to St. Luke's Hospital with no change in her symptoms. She complained of knee pain, though she took no medication. Her knee appeared to be healed and had full strength. There was a small bone step-off in the patella. She was instructed to continue with her physical therapy.

### 2. The Commissioner's Record Review

On December 17, 2010, at the request of the Commissioner, medical consultant J. Kost reviewed Jackson's medical records, and completed a Physical Residual Functional Capacity Assessment. He noted that the diagnosis was a patella fracture. Under exertional limitations,

13

Kost indicated that Jackson could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand and walk (with normal breaks) for about 6 hours in an 8 hour workday, and sit for about 6 hours in an 8 hour workday. There were no postural, manipulative, visual, communicative, or environmental limitations. Kost concluded that Jackson could be expected to attain an RFC for light work by 12 months after the patella fracture, or October 1, 2011.

## III.   The Administrative Hearing

Jackson appeared, without counsel, at a hearing before ALJ Penalver on November 22, 2011. (R. 46-48.)

### A. Jackson's Testimony

Jackson testified that she was living in an apartment with her daughter (though also mentioned her son living at home). She had a driver's license but was unable to drive because her leg was not strong enough. Jackson took the train, approximately 45 minutes, to get to the hearing. Jackson testified that she stopped visiting friends and relatives because it was hard for her to walk up and down the stairs and there were no elevators. Jackson's daughter helped with some of the cooking and grocery shopping. Both of her children helped with the dishes and the laundry.

Jackson received vocational training in 2007 to become a medical assistant. The training was approximately 18 months long. Jackson stopped working in 2008, and received unemployment compensation, including some compensation in 2011. The ALJ asked Jackson if she believed she could work when she applied for unemployment, and Jackson responded that she did believe she could work at the time because she was taking her medication.

Jackson testified that she had worked as a medical assistant at a clinic, where she was the sole assistant to five doctors. Her duties included getting patient charts, taking patients' vital

14

signs, drawing blood, making appointments, medical billing, and assisting the doctors during the examination of female patients. Jackson testified that she lost her job in March 2008. She did not fully understand why she was let go, but believed that the clinic had some problems with the IRS. She did not have any personal problems with anyone at the clinic. Jackson tried to find other work, but employers would not accept her medical assistant certificate without a GED. Jackson testified that she applied for jobs up until she broke her leg. When asked if she thought she could be a medical assistant now, she answered, "I don't know . . . being around the people. . . . [I]t makes me, like nervous." (R. 66.)

Jackson testified that she was being treated for depression and anxiety at South Bronx Mental Health Clinic. She started treatment there in July 2011. Before then, she was treated at the Karen Horney Clinic.[6] She started going to the Karen Horney Clinic in 2008, and stopped going in approximately January 2011. Jackson testified that she saw a psychiatrist once a month for her prescriptions and a therapist twice a week. She also participated in group therapy once a month. Jackson testified that she did not believe she could return to work because she had difficulties being around other people. While her medications helped, she still had panic attacks.

Jackson also testified that in October 2010, she fractured her right knee. Her knee hurt every day, despite surgery to repair the fracture. She was taking over-the-counter medications to manage the pain. Jackson estimated that she could walk two to three blocks and could stand for approximately 10 minutes at a time. Jackson could sit, except that her knee became stiff if she sat for long periods of time. Jackson estimated she could lift 10 pounds.

---

[6] Jackson misidentified the Karen Horney Clinic as the Ryan Horney Clinic during her hearing.

The ALJ provided Jackson with a form to take to her pharmacist to obtain a list of all of her prescriptions. He instructed her to mail the list to the ALJ for the record. He also indicated that he would seek the treatment records for St. Luke's Roosevelt Hospital, South Bronx Mental Health Clinic and the Karen Horney Clinic. In addition, the ALJ told Jackson that he would give her a form and an envelope to take to her current treating physician to obtain an opinion for the administrative record.

### B. Vocational Expert Testimony

A vocational expert testified by telephone at the hearing. The expert first identified Jackson's past work. Her first job was as a sales associate in retail sales, which is considered a light semi-skilled occupation. Jackson's second type of past work was as a medical assistant, which is considered light work, with occasional medium level exertion, and is a skilled occupation.

The ALJ then asked the vocational expert to assume an individual of Jackson's age, education, and work experience, who was capable of performing a "reduced range of light work," occasionally lifting 20 pounds and frequently lifting 10 pounds, who could stand or walk for approximately four hours per eight hour work day and could sit for approximately six hours per eight hour work day. The individual could never use the right foot for control operations and could never climb ladders, ropes, or scaffolds, though she could occasionally climb ramps or stairs. The individual could occasionally crouch, kneel, or crawl. Furthermore, this individual would be limited to simple routine tasks and could only have occasional interaction with the public and with coworkers. (R. 93.) The vocational expert testified that such an individual would not be able to perform either of Jackson's prior jobs. Such a person could, however, perform the job of bench assembly, which is a sedentary unskilled job. The vocational expert testified that

16

there were 2,000 bench assembly jobs in the greater New York area and 70,000 jobs nationally. The vocational expert additionally identified the job of bench packaging, which is also unskilled. There were approximately 15,000 to 16,000 jobs in the local economy and 35,000 to 40,000 jobs in the national economy. The vocational expert could identify no other jobs that would satisfy the ALJ's criteria.

The ALJ gave a second hypothetical in which all of the previously mentioned criteria remained the same, except the individual could not tolerate any social interaction with co-workers or the public, or any supervision. The vocational expert testified that there were no jobs that would meet those restrictions. Then, taking into account that there was a period of time in which Jackson had no physical limitations, the ALJ asked the vocational expert to consider an individual of Jackson's age, education, and work experience, who could perform medium work with no postural limitations, but who was limited to simple routine tasks, and occasional interaction with the public and coworkers, and occasional supervision. The vocational expert identified "cleaner," which is an unskilled job. There were about 2,700 such jobs in the local economy and 700,000 nationally. (R. 99.) The vocational expert also identified "messenger." This is an unskilled job, with approximately 6,300 jobs in the local economy and 300,000 jobs in the national economy. (R. 99-100.)

On April 6, 2012, the ALJ issued his decision denying Jackson's claim disability benefits, and on March 23, 2013, the Appeals Council denied Jackson's request for review, thereby rendering the decision of the Commissioner final.

# DISCUSSION

## I.   Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial . . . ." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (citation omitted). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable

factfinder would *have to conclude otherwise*" (citation and internal quotation marks omitted; emphasis in original)).

"Before determining whether the Commissioner's conclusions are supported by substantial evidence, however, 'we must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009) (quoting Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990)). The Act "must be liberally applied, for it is a remedial statute intended to include not exclude." Cruz, 912 F.2d at 11. This is particularly true in the case of *pro se* claimants, who "are entitled to a liberal construction of their pleadings," and, therefore, their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see Alvarez v. Barnhart, 03 Civ. 8471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal *pro se* standard in reviewing denial of disability benefits).

## II.    Definition of Disability

A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

19

engage in any other kind of substantial gainful work which exists in the national economy . . . ."

42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-

step sequential evaluation process when making disability determinations. See 20 C.F.R. §§

404.1520, 416.920. The steps are followed in order: if it is determined that the claimant is not

disabled at a step of the evaluation process, the evaluation will not progress to the next step. The

Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in
> substantial gainful activity. Where the claimant is not, the Commissioner next
> considers whether the claimant has a "severe impairment" that significantly limits
> her physical or mental ability to do basic work activities. If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on medical evidence,
> the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 .
> . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is
> whether, despite the claimant's severe impairment, she has the residual functional
> capacity to perform her past work. Finally, if the claimant is unable to perform her
> past work, the burden then shifts to the Commissioner to determine whether there
> is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears

the burden of proof as to the first four steps. Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). It

is only after the claimant proves that she cannot return to prior work that the burden shifts to the

Commissioner to show, at step five, that other work exists in the national and local economies

that the claimant can perform, given her RFC, age, education and past relevant work experience.

20 C.F.R. §§ 404.1560(c)(2), 416.960(c)(2); Melville, 198 F.3d at 51.

Title 20 C.F.R. §§ 404.1520a and 416.920a provide additional information to guide

evaluations of mental impairments. Calling it a "complex and highly individualized process,"

these sections focus the ALJ's inquiry on determining how the impairment "interferes with [the

claimant's] ability to function independently, appropriately, effectively, and on a sustained

basis." 20 C.F.R. §§ 404.1520a(c)(1),(2), 416.920a(c)(1)(2). The main areas that are assessed

are activities of daily living, social functioning, concentration, persistence, or pace, and episodes

of decompensation; each is rated on a five-point scale. 20 C.F.R. §§ 404.1520a(c)(3)-(4),

416.920a(c)(3)-(4). If an impairment is given the rating of "severe," then the ALJ is instructed to

determine whether the impairment qualifies as a listed mental disorder. 20 C.F.R. §§

404.1520a(d)(2), 416.920a(d)(2).

An affective disorder, such as depression or bipolar disorder, will qualify as a "listed

impairment" if there is medically documented persistence, either continuous or intermittent, of

depressive syndrome, manic syndrome, or bipolar syndrome resulting in at least two of the

following: (1) marked restriction of activities of daily living; (2) marked difficulties in

maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence,

or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt.

404, Subpt. P, App'x. 1 §§ 12.04(A), 12.04(B) (so called "paragraph B criteria"). If the mental

disorder does not qualify as a listed impairment under these standards, it will still qualify as a

disability if there is:

> [a] [m]edically documented history of a chronic affective disorder of at least 2
> years' duration that has caused more than a minimal limitation of ability to do basic
> work activities, with symptoms or signs currently attenuated by medication or
> psychosocial support, and one of the following: [r]epeated episodes of
> decompensation, each of extended duration; or a [r]esidual disease process that has
> resulted in such marginal adjustment that even a minimal increase in mental
> demands or change in the environment would be predicted to cause the individual
> to decompensate; or [c]urrent history of 1 or more years' inability to function
> outside a highly supportive living arrangement, with an indication of continued
> need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(C) (so called "paragraph C criteria").

### III.    The ALJ's Determination

Jackson's claim alleges both physical and mental impairments. In a written decision, dated April 26, 2012, the ALJ concluded that Jackson had not been under a disability within the meaning of the Social Security Act from March 28, 2008, the alleged date of onset, through the date of the decision. (R. 10.) The ALJ found that Jackson did meet the insured status requirements for SSD benefits through December 31, 2013, and had not engaged in substantial gainful activity since March 28, 2008. (R. 12.) Jackson's reported earnings from 2010 to 2011 were unemployment benefits. (R. 12.)

The ALJ found that Jackson had the following severe impairments, each of which significantly affected Jackson's ability to perform work activities: (1) major depressive disorder; (2) personality disorder; (3) alcohol abuse; and (4) status-post right knee fracture. (R. 13.) The ALJ, however, concluded that none of the impairments, or the combination of impairments, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. Jackson's knee disorder failed to satisfy the criteria at section 1.02(A) because she was "able to ambulate effectively." (R. 13.) As for Jackson's mental impairments, the ALJ concluded that none of them individually or together satisfied the "paragraph B" or "paragraph C" criteria of sections 12.04 and 12.09. (R. 13.) Jackson had only mild restrictions in daily living and mild difficulties in concentration, persistence or pace. (R. 13.) The ALJ concluded that she did have moderate difficulties in social functioning but found no evidence of episodes of decompensation of extended duration. (R. 13.) Because Jackson's impairments did not result in either marked difficulties in two areas or marked difficulties in one area along with episodes of decompensation, the ALJ concluded that the "paragraph B" requirements were not satisfied. (R. 14.) The ALJ further concluded that the "paragraph C"

requirements of section 12.04 were not satisfied because there was "no evidence of decompensation, the likelihood of future decompensation, or the inability to live outside a highly supportive living arrangement." (R. 14.)

In determining residual functional capacity, the ALJ differentiated between the period before Jackson's knee injury and the period after the injury, with October 1, 2010, as the pivotal date. Before this date, the ALJ found that Jackson had the capacity to perform medium work, with the following limitations: (1) simple routine tasks; (2) occasional interaction with the public and co-workers; (3) and occasional supervision. (R. 14.) From October 2, 2010, Jackson could perform light work with the following limitations: (1) standing and walking limited to four hours in an eight hour workday; (2) sitting limited to six hours in an eight hour workday; (3) the inability to use her right foot to operate foot controls; (4) the inability to climb ladders, ropes, and scaffolds; (5) the ability to occasionally climb ramps and stairs; (6) the ability to occasionally crouch, kneel, and crawl; (7) the ability to perform simple routine tasks; and (8) the ability to tolerate only occasional interaction with the public and coworkers. (R. 14.)

In making this determination the ALJ considered Jackson's symptoms, the opinion evidence, and the objective medical evidence. (R. 14.) While the ALJ concluded that Jackson's impairments could reasonably be expected to cause her alleged symptoms, he did not believe that her statements regarding intensity, persistence, and limiting effects were credible because they were "inconsistent with the . . . residual functional capacity assessment." (R. 15.) The ALJ then provided a summary of the objective medical evidence and the opinion evidence which supported his RFC determination and contradicted Jackson's testimony regarding her symptoms. The ALJ specifically noted that the FEGS records and the South Bronx Mental

23

Health records reported that Jackson could complete all or most of her activities of daily living. (R. 16.)

The ALJ gave little weight to a notation from Jackson's former treating physician, Dr. Paul, dated July 16, 2010, that the claimant could not work due to psychiatric symptoms. (R. 16.) The ALJ noted that Dr. Paul indicated in the same note that Jackson was motivated towards treatment and had formed a good relationship with her therapist. (R. 16.) He further justified giving little weight to Dr. Paul's opinion because he "did not set forth any specific work-related limitations and indicated that improvement may occur within 6 months." (R. 16.) The ALJ emphasized that while Jackson's early GAF score was 40, by 2011 she had improved to GAF scores ranging from 60-65. (R. 16.) During a July 2011 examination, Jackson was anxious, but only mildly depressed. (R. 16.) She had fair impulse control and good memory skills. (R. 16.)

The ALJ gave "great weight" to Dr. Bougakov's opinion based on his consultative psychiatric evaluation, finding it to be supported by the medical evidence. (R. 16.) Dr. Bougakov concluded that Jackson could follow and understand simple directions and instructions, perform simple tasks, make appropriate decisions, relate adequately to others, and deal with stress. (R. 16.) She was, however, somewhat limited in her ability to learn new tasks and perform complex tasks. (R. 16.)

As for Jackson's physical impairments, the ALJ concluded that "her knee impairment has caused more than minimal limitations from the day of her injury." (R. 17.) He did not, however, believe that the medical evidence suggested limitations that exceeded his RFC assessment. The ALJ emphasized that the follow-up x-rays showed that the fracture was healing and that Jackson did not take medication for her knee pain. (R. 16-17.) He stated that her knee was asymptomatic

as of July 19, 2011, and that Jackson reported to her physicians a month earlier that she was only restricted in activity because of her knee for four months. (R. 17.)

At step four, the ALJ found that Jackson was unable to perform any past relevant work given her limitations. (R. 17.) At step five, considering the claimant's age, education, work experience, and RFC, the ALJ concluded that there were jobs in significant numbers in the national economy that Jackson could perform. (R. 17.) This determination was made in reliance a vocational expert's testimony that, given the limitations set forth in Jackson's RFC, she could perform the jobs of bench assembly and bench packaging. (R. 18.)

## IV.   Analysis

### A. Legal Standard

#### 1.   Duty to Develop the Record

When the ALJ assesses a claimant's alleged disability, the ALJ must develop the claimant's medical history for at least a twelve-month period.  42 U.S.C. § 423(d)(5)(B), 20 C.F.R. §§ 404.1512(d), 416.912(d).  Further, the Act authorizes the Commissioner to "issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation . . . ." 42 U.S.C. § 405(d).

The Court of Appeals considers this statutory authorization to impose an affirmative duty on the ALJ to develop the record. Indeed, before a district court can evaluate the ALJ's conclusions, the court must ensure that the claimant received a full hearing. Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (holding that an ALJ must ensure that the claimant had a "full hearing under the Secretary's regulations and in accordance with the beneficent purposes of the Act" (citing Gold v. Sec'y of HEW, 463 F.2d 38, 43 (2d Cir. 1972))). Due to the "non-adversarial nature" of social security proceedings, a full hearing requires the

ALJ to "affirmatively develop the record." Echevarria, 685 F.2d at 755. Whether or not the claimant is represented by counsel, Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999), the ALJ must contact medical sources and gather any additional information if the ALJ believes that the record is inadequate to make a determination. When a claimant is *pro se*, however, "the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" Cruz, 912 F.2d at 11 (quoting Echevarria, 685 F.2d at 755) (internal quotation marks omitted). This entails a heightened obligation to ensure both the completeness and the fairness of the administrative hearing. See Cullinane v. Sec'y of Dep't of Health and Human Servs., 728 F.2d 137, 137 (2d Cir. 1984) (describing an ALJ's "affirmative duty to ensure that pro se disability insurance benefit claimants receive full and fair hearings"). When the ALJ has failed to develop the record adequately, the district court must remand to the Commissioner for further development. See, e.g., Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

The ALJ's duty to develop the record is further enhanced when the disability in question is a psychiatric impairment. The Regulations articulate that claims concerning mental disorders require a robust examination that is sensitive to the dynamism of mental illnesses and the coping mechanisms that claimants develop to manage them:

> Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress.

26

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E).  Similarly, Social Security Ruling 85-15 directs

the Commissioner to consider that "[d]etermining whether these individuals will be able to adapt

to the demands or 'stress' of the workplace is often extremely difficult."  SSR 85-15 at *5. The

Ruling explains that this difficulty arises because individuals with mental illnesses "adopt a

highly restricted and/or inflexible lifestyle within which they appear to function well."  Id. at 6.

The Rulings point out that, when claimants are in structured settings, they are able to function

adequately "by lowering psychological pressures, by medication, and by support from services . .

. ." Id.

        Proper application of the rule ensures that the claimant's record is comprehensive,

including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain

clearly how these opinions relate to the final determination. In this circuit, the rule is robust. See,

e.g., Schaal v. Apfel, 134 F.3d 496, 503-05 (2d Cir. 1998) (remanding a case to the SSA for

further development "because we are unsure exactly what legal standard the ALJ applied in

weighing [the treating physician's] opinion, because application of the correct standard does not

lead inexorably to a single conclusion, and because the Commissioner failed to provide plaintiff

with 'good reasons' for the lack of weight attributed to her treating physician's opinion as

required by SSA regulations"). When the ALJ fails to develop the record adequately, the district

court must remand to the Commissioner for further development. See, e.g., Kercado ex rel. J.T.

v. Astrue, 08 Civ. 0478 (GWG), 2008 WL 5093381, at *1 (S.D.N.Y. Dec. 3, 2008) (citing cases).

        **2. Treating Physician Rule**

        The "treating physician rule" is inextricably linked to the duty to develop the record.

Under the treating physician rule, the ALJ is required to give the medical opinion of a treating

physician "controlling weight" on whether or not claimant's impairments prevented her from

being able to engage in substantial gainful activity if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citation omitted) (alteration in original). "When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). See also Rivera v. Comm'r of Soc. Sec., 728 F. Supp. 2d 297, 327 (S.D.N.Y. 2010) (finding the ALJ validly rejected the treating physicians' opinions because they conflicted with plaintiff's admitted daily activities and other evidence in the record; thus, remand for reapplication of the treating physician rule was not appropriate). A report by a consultative physician may constitute substantial evidence when the treating physician's opinion is inconsistent with other substantial evidence in the record. Guzman v. Astrue, 09 Civ. 3928 (PKC), 2011 WL 666194, at *9 (S.D.N.Y. Feb. 4, 2011).

   If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure, considering the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). This process must also be transparent: the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). Indeed, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision. Snell, 177 F.3d at 134.

### 3. Medical Source Opinions

Consideration of the duty to develop the record, together with the treating physician rule, produces an obligation that encompasses the duty to obtain information from physicians who can provide opinions about the claimant. If a physician's report is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's other reports, the ALJ must "affirmatively seek out clarifying information from the doctor" before discrediting the opinion. Duncan v. Astrue, 09 Civ. 4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). See also Calzada v. Astrue, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician."); Cruz, 912 F.2d at 12 ("[W]hen the ALJ rejects the findings of a treating physician because they were conclusory or not supported by specific clinical findings, he should direct a *pro se* claimant to obtain a more detailed statement from the treating physician."). Indeed, the ALJ possesses the statutory authority to request that physicians provide clarification regarding the claimant's condition during the relevant period, 42 U.S.C. § 405(d), and the regulations appear to mandate that a medical opinion is sought, 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6).

The ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced. This is, in part, because the ALJ is required to "probe into, inquire of, and explore for *all* the relevant facts," Cruz, 912 F.2d at 11 (emphasis supplied) and "review *all* pertinent information

29

relative to [the claimant's] condition," 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)

(emphasis supplied). This is particularly true where the claimant is *pro se* and is seeking

disability benefits for a psychiatric impairment. See e.g., Peed v. Sullivan, 778 F. Supp. 1241,

1246 (E.D.N.Y. 1991) ("[W]hen the claimant appears pro se, the combined force of the treating

physician rule and of the duty to conduct a searching review requires that the ALJ make every

reasonable effort to obtain not merely the medical records of the treating physician but also a

report that sets forth the opinion of that treating physician as to the existence, the nature and the

severity of the claimed disability."); Jones v. Apfel, 66 F. Supp. 2d 518, 524 (S.D.N.Y. 1999)

(concluding that ALJ failed to develop the record by failing to secure any report from the treating

physician); Cruz, 912 F.2d at 11.

## B.  Application

### 1.  Mental Impairments

Jackson argues that the ALJ failed to fully and fairly develop the record by not obtaining

an updated opinion from a current treating mental health specialist, specifically one from South

Bronx Mental Health Council. (Pls.' Mot. for Judgment on the Pleadings ("Pls.' Mot."), at 9-10.)

The ALJ did subpoena and receive the underlying medical treatment records from South Bronx

Mental Health Council; but he did not himself seek out an opinion statement. Instead, he

provided Jackson with a form and instructed her to submit it to her current treating physician

within 30 days. No further mention is made of this report and there appears to be no opinion

from the current treating physician in the administrative record. (Id.)

Whether the ALJ failed to develop the record adequately must be addressed as a

threshold issue. Indeed, the Court cannot rule on whether the ALJ's decision regarding Jackson's

functional capacity was supported by substantial evidence if the determination was based on an

incomplete record. The central issue before this Court, therefore, is the extent of the ALJ's duty to develop the record before making a determination of disability. The Court finds that though the ALJ generally sought, received, and reviewed the underlying treatment records for at least one year before Jackson's filing date, given Jackson's *pro se* status at the hearing, her mental impairments, and the ALJ's emphasis on her improvement within the last few months before the hearing, the ALJ failed to develop the record fully so as to consider all the facts relevant to Jackson's disability.

In his written decision, the ALJ noted that Jackson's medical records from South Bronx Mental Health Center showed improved GAF scores and other signs of improved mental health. Jackson's GAF in January and March 2011 was 40, indicating major impairments in several areas. The treatment notes from June 2011 to November 2011, however, show that Jackson's GAF scores were in the 60s, indicating mild to moderate symptoms, though she remained anxious and depressed and had not achieved psychiatric stability. Indeed, her Treatment Plan Review, dated November 8, 2011, indicated as a primary "goal" to obtain psychiatric stability, with a target date of February 8, 2012. (R. 347.) Absent an opinion from her current physician at South Bronx Mental Health Council, it is difficult to assess what this improvement meant for her specific work abilities.

As an initial matter, because the ALJ reviewed and relied on medical records that post-date Jackson's application for benefits, the ALJ is not excused from obtaining an opinion statement from her current physician. See Scott v. Astrue, 09 Civ. 3999 (KAM)(RLM), 2010 WL 2736879, at *14 n.60 (E.D.N.Y. July 9, 2010) ("[T]he ALJ is responsible for developing a full and complete record between the time that elapses between plaintiff's application and plaintiff's hearing date." (citing Pettey v. Astrue, 582 F. Supp. 2d 434 (W.D.N.Y. 2008), and Lisa v. Sec'y

of the Dep't of Health & Human Servs., 940 F.2d 40, 44 (2d Cir. 1991)); Atkinson v. Barnhart,

87 F. App'x 766, 768-69 (2d Cir. 2004) (holding that an ALJ failed to develop the record by not

obtaining records of a current treating physician regarding psychiatric treatment, and then

concluding that plaintiff's mental impairments were not serious because she never sought

psychiatric treatment).

  Furthermore, because "[t]he expert opinions of a treating physician as to the existence of

a disability are binding on the fact finder, it is not sufficient for the ALJ simply to secure raw

data from the treating physician. What is valuable about the perspective of the treating physician

– what distinguishes him from the examining physician and from the ALJ – is his opportunity to

develop an informed *opinion* as to the [mental health] status of a patient." Peed, 778 F. Supp. at

1246. As the Court noted in Peed, there is a "distinctive quality" in the opinion of the treating

physician that makes his evidence much more reliable than that of an examining physician who

sees the claimant just once. Id. at 1246.

  Given that the ALJ emphasized Jackson's improvement in his disability determination,

relied on the underlying treatment records from South Bronx Mental Health Center, and rejected

the prior treating physician's opinion, the ALJ had an affirmative duty to develop the record fully

by obtaining an opinion from Jackson's current treating physician. See e.g., Peed, 778 F. Supp. at

1247 (remanding for failure to obtain an opinion from claimant's treating physician); Beller v.

Astrue, 12 Civ. 5112 (VB)(PED), 2013 WL 2452168, at *18 (S.D.N.Y. June 5, 2013)

(concluding that the relationship between the treating physician rule and the duty to develop the

record required the ALJ to request an RFC assessment from a treating physician). The ALJ was

required to make every reasonable effort to obtain this opinion; merely providing the necessary

forms to Jackson was not sufficient to satisfy this obligation. See e.g., Jones, 66 F. Supp. 2d at

533, 539-40 (remanding for further development of the record when the ALJ did not assist a claimant with mental impairments in obtaining her medical records though he had informed her of the need for them and sent her a follow-up letter regarding the documents).

The ALJ also erred by giving little weight to the medical opinion of Dr. Paul, Jackson's former treating physician who indicated that Jackson's mental impairments interfered with her ability to work. This was Dr. Paul's opinion in July 2010 ("Pt.'s psychiatric [symptoms] currently prevent her from working. Amongst other issues, [patient] has difficulty leaving her home due to anxiety, paranoia, and panic attacks.") (R. 216); and that opinion had not changed at the time of her discharge (for attendance problems) from the Karen Horney Clinic in January 2011, six months later ("Her psychiatric symptoms are barriers to gaining employment."). (R. 480).

The ALJ, however, dismissed Dr. Paul's opinion, because the physician also noted that Jackson was motivated toward treatment and had developed a good relationship with her therapist. He further afforded little weight to the opinion statement about her ability to work because it did not "set forth any specific work-related limitations and indicated that improvement may occur within 6 months." (R. 16.)

It was error for the ALJ to discount Dr. Paul's opinion for lack of specificity and then fail to contact him to obtain a more detailed opinion statement. The Court of Appeals has "repeatedly stated that when the ALJ rejects the findings of a treating physician because they were conclusory or not supported by specific clinical findings, he should direct a *pro se* claimant to obtain a more detailed statement from the treating physician." Cruz, 912 F. at 12; Echevarria, 685 F.2d at 756. See also Burgess, 537 F.3d at 129 ("In light of the ALJ's affirmative duty to develop the administrative record, an ALJ cannot reject a treating physician's diagnosis without

first attempting to fill any clear gaps in the administrative record." (citation and quotation marks omitted)); <u>Hankerson v. Harris</u>, 636 F.2d 893, 896 (2d Cir. 1980) ("Before the ALJ can reject an opinion of a pro se claimant's treating physician because it is conclusory, basic principles of fairness require that [the ALJ] inform the [pro se] claimant of his proposed action and give him an opportunity to obtain a more detailed statement").

In light of the facts in this case – that Jackson's treating physician consistently reported that her psychiatric symptoms were a barrier to employment, and the ALJ's rejection of the former treating physician's opinion for failing to articulate specific work-related limitations – the ALJ's failure to obtain a clarifying opinion statement requires remand. <u>See</u> <u>Rosa</u>, 168 F.3d at 83 (holding that remand is appropriate when "the ALJ failed to develop the record sufficiently to make any appropriate determination in either direction").

Finally, the ALJ erred in giving the opinion of Dr. Bougakov, the consultative physician "great weight." (R. 16.) The ALJ found the opinion to be supported by the medical evidence and the examination of the patient. Opinions from a one-time consultative physician, however, are not ordinarily entitled to significant weight. <u>Selian v. Astrue</u>, 708 F.3d 409, 419 (2d Cir. 2013) ("ALJ's should not rely heavily on the findings of consultative physicians after a single examination.") <u>See</u> <u>Crespo v. Apfel</u>, 97 Civ. 4777 (MGC), 1999 WL 144483, at *7 (S.D.N.Y. Mar. 17, 1999) ("In making a substantial evidence evaluation, a consulting physician's opinions or report should be given limited weight" because "they are often brief, are generally performed without benefit or review of the claimant's medical history, and at best, only give a glimpse of the claimant on a single day." (quoting <u>Cruz</u>, 912 F. 2d at 13)). Dr. Bougakov was not provided with Jackson's medical records. (Plt's Mot. At 13.) This lack of supporting and explanatory documentation, the limited nature of a consultative evaluation, and the ALJ's improper

assessment of a treating physician's opinion undermine the ALJ's determination that "great weight" should be given to Dr. Bougakov. See Burgess, 537 F.3d at 132 (holding that the opinion of a consultative examiner who did not review an important medical report could not constitute substantial evidence).

Accordingly, I recommend remand for further development of the record. On remand, the Commissioner should obtain clarifying information, such as an RFC assessment, from Dr. Paul and should obtain an opinion as to non-exertional limitations from Jackson's current treating physician at South Bronx Medical Health Council.

### 2. Jackson's Credibility

Jackson also argues that the ALJ failed to evaluate her credibility properly, comparing her subjective statements to the ALJ's residual functional capacity, rather than against the evidence in the record. Jackson contends that the ALJ improperly relied on her GAF scores and the absence of any evidence of hospitalization.

Although the ALJ did use disapproved "boiler plate" language rejecting Jackson's statements as incredible because "they [were] inconsistent with the above residual functional capacity assessment,"[7] the ALJ did not rely solely on this justification for his credibility finding.

---

[7] The Court of Appeals for the Seventh Circuit found this language to be inconsistent with SSR 96-7p, which explains that the "adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence." See Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012). The court must specifically consider the statements in the light of the rest of the objective record of evidence. See Cruz v. Colvin, 12 Civ. 7346 (PAC)(AJP), 2013 WL 3333040, at *16 (S.D.N.Y. July 2, 2013). To dismiss a claimant's testimony based on its incompatibility was an RFC "gets things backwards" because it "implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson, 671 F.3d at 645. See also Cruz, 2013 WL 3333040, at *16 ("The ALJ's conclusory reasoning is unfair to the claimant, whose subjective statements about his

The ALJ explained the parts of the record that he believed contradicted Jackson's assertions regarding the intensity and severity of her impairments. Given that the Court recommends remand for further development of the record, the Commissioner will be required to reassess both Jackson's credibility and her RFC in light of the new evidence. If the Commissioner makes a negative credibility finding, she should be careful to provide a detailed explanation as to what specific evidence in the record contradicts Jackson's subjective testimony.

### 3. Physical Impairments

Jackson mentions her physical impairments only sporadically in her motion for judgment on the pleadings, mostly in regard to the ALJ's credibility assessment. The Court concludes that the ALJ's finding that Jackson's physical impairment was not disabling is supported by substantial evidence.

In February 2011, Jackson was examined at the orthopedic clinic at St. Luke's Roosevelt Hospital. She walked with a cane and her range of motion was limited to 100 degrees. She was advised to continue using a cane and to undergo physical therapy. (R. 352.) In February 2011, an x-ray of Jackson's knee showed increased density of the bone, suggesting that the fracture was healing. (R. 353.) She had no pain, but was walking with a cane and complained of stiffness. (R. 352.) In May 2011, the physician discussed the possibility of removing the hardware in Jackson's knee, but she preferred to wait until September. (R. 351.) On October 17, 2011, the underlying treatment records indicate that Jackson continued to complain of pain, stiffness, and buckling, even after five months of physical therapy. (R. 280.) Jackson had some weakness in her right quadricep, decreased range of motion, and tenderness. (R. 280.) Jackson was diagnosed

---

symptoms are discarded if they are not compatible with an RFC that has been predetermined based on other factors.")

with painful hardware of the right knee and possible non-union of the patella. (R. 280.) On

October 31, 2011, the treatment notes indicate that Jackson had a healed patella fracture with a

small bone step-off. She had full strength, though she continued to experience knee pain. (R.

279.)

   To qualify as a disability under the listing 1.02(A), Jackson must demonstrate an

'[i]nability to ambulate effectively," which means "an extreme limitation of the ability to walk;

*i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently

initiate, sustain, or complete activities." Unlike with Jackson's mental impairments, there are no

treating physician opinions or underlying treatment records that directly contradict the ALJ's

finding that she is able to ambulate effectively or as to her RFC. While there is no record of a

consultative examination performed at the request of the Commissioner, such an exam is not

necessary unless the ALJ cannot make a determination as to disability based solely on the

medical record before him. See 20 C.F.R. 404.1519a(a), 416.919a(a) ("If we cannot get the

information we need from your medical sources, we may decide to purchase a consultative

examination.")

   While the ALJ appears to have misconstrued the record when stating that Jackson's knee

was "asymptomatic as of July 19, 2011" (R. 17), he did not completely disregard her testimony

or the medical record as to her pain and stiffness in determining her RFC. The ALJ included

relevant restrictions in Jackson's RFC to account for her symptoms. Jackson could perform light

work after October 1, 2010, the date of her accident, with the following limitations: (1) standing

and walking limited to four hours in an eight hour workday; (2) sitting limited to six hours in an

eight hour workday; (3) the inability to use her right foot to operate foot controls; (4) the

inability to climb ladders, ropes, and scaffolds; (5) the ability to climb ramps and stairs

occasionally; and (6) the ability to crouch, kneel, and crawl occasionally. This RFC is supported by the Commissioner's medical consultant J. Kost. (R. 245-249), who expected Jackson to attain an RFC for light work within 12 months of her fracture, or by October 1, 2011. (R. 248.) Given that the ALJ's determination as to Jackson's RFC is supported by the underlying treatment records and the opinion of the Commissioner's medical consultant, the Court concludes that the ALJ's finding as to Jackson's physical impairment is supported by substantial evidence and without legal error.

## CONCLUSION

For the foregoing reasons, I recommend that the plaintiff's motion for judgment on the pleadings be GRANTED in part and DENIED in part, that the Commissioner's motion be GRANTED in part and DENIED in part, and that the case be REMANDED for further administrative proceedings concerning the plaintiff's psychiatric impairments.

*       *       *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Alison J. Nathan at the Thurgood Marshall Courthouse, 40 Foley

Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must

be addressed to Judge Nathan. The failure to file these timely objections will result in a waiver of

those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
            June 11, 2014

39